**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HEATHER BRADY,<br><br>Plaintiff,<br><br>v.<br><br>CHIEF OF POLICE BRENT ROALSON, JONATHAN BERNINGER, SCOTT CRUZ, RANDY LEININGER, KEVIN REYNOLDS, and THE CITY OF OTTAWA,<br><br>Defendants. | ) | No. 22 C 1587<br><br>Judge Sara L. Ellis |

**OPINION AND ORDER**

On March 27, 2020, officers from the Ottawa Police Department conducted a well-being check on Mark Nephew based on a call from an unknown person. During their well-being check, the officers questioned Plaintiff Heather Brady and searched her home. Following this incident, Brady filed this *pro se* lawsuit against Defendant Officers Jonathan Berninger, Randy Leininger, Sergeant Scott Cruz, and Detective Kevin Reynolds (collectively, the "Officer Defendants"), Chief of Police Brent Roalson, and the City of Ottawa (for indemnification purposes only). In her amended complaint, Brady brings claims for unlawful detention, illegal search and seizure, conspiracy, failure to intervene, and deliberate indifference pursuant to 42 U.S.C. § 1983, as well as state law claims for intentional and negligent infliction of emotional distress, negligence, deliberate indifference, and indemnification. Defendants now move to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] Because the Court finds that Brady has stated claims for illegal search and seizure, conspiracy, and failure

[1] In her response, Brady asked for additional time to address three of Defendants' arguments concerning the viability of her (1) official capacity claims against Chief Roalson, (2) individual capacity claims against the Officer Defendants, and (3) request for punitive damages from the City. Given that Brady is proceeding *pro se*, the Court addresses these arguments on the merits instead of finding them waived.

to intervene, and that qualified immunity does not protect the Officer Defendants from liability at the pleading stage, Brady may proceed to discovery on these claims. But because Brady has failed to sufficiently allege *Monell* liability and her state law claims are time-barred, she may not proceed on these claims.

**BACKGROUND[2]**

In the early morning hours of March 27, 2020, Brady awoke to find her fiancé, Nephew, behaving strangely. Brady observed Nephew emptying a garbage can out of the bedroom window while shouting "I got this." Doc. 20 ¶ 16. She also saw that he had wrapped belts around the couples' dog. When Brady asked Nephew what was going on, he grabbed a bed sheet and ran out of the room. A little while later, Brady found Nephew in the driveway rolling around and screaming "Help me. Help me!" *Id.* ¶ 20. Brady asked Nephew what was wrong, but he did not respond. Brady believed that Nephew, who was epileptic and suffered from grand mal seizures, was having an "epileptic episode." *Id.* ¶ 21. In the past, Brady had observed Nephew having a "psychotic episode and break from reality" prior to having a seizure. *Id.* ¶ 14(c).

Meanwhile, an unknown person called the Ottawa Police Department, which dispatched Officers Berninger and Leininger to Brady's house to perform a "well-being check" on Nephew. *Id.* ¶ 22. Berninger, the only officer to provide a written report, reported that upon arriving at the house he saw Nephew on the ground with Brady by his side and that Nephew was rolling from side to side "in obvious distress." *Id.* ¶ 23. Berninger attempted to question Nephew, but he was unresponsive. Brady told Berninger that Nephew was having a seizure and needed emergency medical attention. Berninger and Leininger then placed themselves between Brady and Nephew and questioned her about the events of that night. She again reiterated that Nephew was having a

[2] The Court takes the facts in the background section from Brady's amended complaint and presumes them to be true for the purpose of resolving Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

seizure and that he was epileptic. The officers, however, told her that they believed Nephew was under the influence of drugs or that his behavior was the result of domestic violence. Eventually, Berninger called for an ambulance, describing Nephew as experiencing an "unknown medical problem or possible psychiatric 'break.'" *Id.* ¶ 30. Shortly after Berninger called for an ambulance, Sergeant Cruz arrived on the scene and "assumed a supervisory role." *Id.* ¶ 31. While waiting for the ambulance, Berninger and Leininger continued to question Brady, focusing on whether Nephew had taken any drugs that night, which she denied.

When the ambulance arrived, the paramedics administered NARCAN, a drug used to treat opioid overdose, to Nephew, which "had zero effect." *Id.* ¶ 47. The paramedics placed Nephew in the back of the ambulance and began CPR. Berninger and Leininger directed Brady away from the ambulance to the front steps of her house where they again questioned her about what happened. Brady again denied that Nephew was on drugs and told the officers she wanted to check on him and go to the hospital with him. But Leininger told her to "remain where she [was]." *Id.* ¶ 52. Berninger and Leininger conferred with Cruz in private, after which the officers told Brady that they would search her house. Brady told the officers that they did not have her consent to search the house, but Leininger stated they were still going to search the house because Leininger, Cruz, and Berninger "believe[d] that a 'crime' had been committed." *Id.* ¶ 59. Approximately one hour after the police initially arrived, Detective Reynolds arrived and began searching and taking photographs of the house. The officers told Brady that she must remain at the house during the search, which Reynolds conducted.

Later, Brady learned that Nephew "died on the street, and two times in the ambulance prior to arrival at the hospital," but that he "arrived at the hospital alive." *Id.* ¶ 57. Nephew ultimately passed away.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court construes Brady's complaint liberally because she is proceeding *pro se*. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 98, 106 (1976))).

## ANALYSIS

### I. Unlawful Detention/Illegal Seizure Claim (Count I)

Brady titled Count I of her amended complaint "Fourth Amendment violation by unlawful detention," *see* Doc. 20 at 17, which the Court interprets as a claim for illegal seizure.[3]

---

[3] Defendants' motion addresses this claim both as a claim for illegal seizure and excessive detention. Because the Officer Defendants did not formally arrest Brady, the Court does not consider constitutional issues that may arise from delays in post-arrest processing. *See, e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) ("[T]he Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest."); *Portis v. City of Chicago*, 613 F.3d 702, 703–04 (7th Cir. 2010) (discussing the presumption established by the Supreme Court in *County of Riverside v.*

*See Erickson*, 551 U.S. at 94 (2007) ("A document filed *pro se* is to be liberally construed." (citation omitted) (internal quotation marks omitted)); *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010) ("[P]laintiffs in federal courts are not required to plead legal theories.").

**A. Seizure**

The Officer Defendants first argue that Brady fails to state a claim because Leininger and Berninger never seized Brady as required for a Fourth Amendment claim. They contend that because Leininger and Berninger did not arrest Brady, no seizure occurred. *See* Doc. 49 at 6 ("The 'seizure' of a 'person' plainly refers to an arrest." (citing *Torres v. Madrid*, 141 S. Ct. 989, 996 (2021))). But the Fourth Amendment is not so restrictive.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend IV. Not all interactions with police officers amount to a "seizure," however, with a seizure occurring when an officer restrains the liberty of a citizen through "means of physical force or show of authority." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). In other words, a seizure occurs if, in view of all of the circumstances, a reasonable person would not feel free to leave. *United States v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008). Some circumstances suggesting a seizure include "the threatening presence of several officers, display of their weapons, physical touching of the private citizen, use of forceful language or tone of voice (indicating that compliance with the officers' request might be compelled), and the location in which the encounter takes place." *Id.* Admittedly, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting

---

*McLaughlin*, 500 U.S. 44, 56–57 (1991), regarding the reasonableness of the time of detention between a formal arrest and presentation to a magistrate for a probable-cause determination); *Chortek v. City of Milwaukee*, 356 F.3d 740, 746–47 (7th Cir. 2004) ("[U]nder *Gerstein* and *County of Riverside*, the length of time taken to complete administrative steps incident to arrest must be reasonable.").

questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). But "an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Looking at all of the circumstances here, Brady has sufficiently pleaded that, even if the encounter with the officers began as a consensual one, at some point during the interaction, a seizure occurred. Perhaps most tellingly, Brady alleges that Officers Leininger and Berninger told her multiple times that she was not free to leave. Doc. 20 ¶ 52 ("Officer Leininger [told] her to remain where she is."); *id.* ¶ 58 ("Officer Leininger told Heather she was not free to leave."); *id.* ¶ 59 ("[Brady] is told she has to stay at her home until the search of the home is completed."). Further, essentially from the time Officers Leininger and Berninger arrived until the search of Brady's house was complete, Brady alleges that Officers Leininger and Berninger questioned her, stood between her and Nephew, and "stay[ed] with her like she [was] in their custody." *Id.* ¶ 59. Thus, the Court finds that Brady has sufficiently alleged the required seizure for purposes of her Fourth Amendment claims. *See Seymour v. City of Des Moines*, 519 F.3d 790, 797 (8th Cir. 2008) (finding seizure commenced "upon [plaintiff] being told that he was not free to leave").

**B. Reasonableness of the Seizure**

Just as not every interaction with police officers qualifies as a "seizure," not every seizure is unreasonable. *Torres*, 141 S. Ct. at 1003 ("The Fourth Amendment does not forbid all or even most seizures—only unreasonable ones."). The Officer Defendants argue that even if they

seized Brady, the seizure was reasonable under the circumstances because they needed to investigate the suspicious circumstances surrounding Nephew's death, particularly in light of his strange behavior preceding his death, and because they had probable cause to do so. *See Norris v. Serrato*, 761 F. App'x 612, 615 (7th Cir. 2019) ("[P]robable cause is an absolute defense to claims under section 1983 against police officers for an allegedly unreasonable seizure[.]"). Brady contends that the Officer Defendants did not have reasonable suspicion or probable cause to suspect her of any crime and did not observe any illegal activity.

"Ordinarily seizures are 'reasonable' only when supported by probable cause to believe an individual has committed a crime." *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014) (citations omitted). Probable cause exists "if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). An exception to the probable cause requirement exists for brief investigatory stops based on a reasonable suspicion of criminal activity. *Navarette v. California*, 572 U.S. 393, 396–97 (2014) (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *Terry v. Ohio*, 392 U.S. 1, 21–22, 30 (1968)).

"For an investigative stop based on reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011) (quoting *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994)). "A *Terry* stop based on reasonable suspicion can ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive." *Id.* But no bright-line test

exists for determining when the length of a *Terry* stop has become unreasonable, with it instead remaining a fact-intensive inquiry. *United States v. Reedy*, 989 F.3d 548, 553 (7th Cir. 2021).

Initially, the Court notes that the Officer Defendants focus on the wrong question. They contend that "the relevant questions" are "whether probable cause existed for the investigation into the death of Mark Nephew and whether plaintiff was a witness from whom the officers required information." Doc. 49 at 13–14. But the fact that the Officer Defendants were investigating Nephew's death, and that there may have been legitimate reasons for their investigation, does not strip Brady of her Fourth Amendment protections. Rather, to have probable cause justifying the Fourth Amendment seizure of Brady, the Officer Defendants needed to have "reasonably trustworthy information" that *Brady* had "committed or was committing an offense." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999).

And here, the amended complaint does not suggest that the Officer Defendants had either reasonable suspicion or probable cause to suspect that Brady had committed a crime. The Officer Defendants' motion references many facts that Brady alleges in her amended complaint, such as that Nephew had placed belts around the couples' dog.[4] But reasonable suspicion and probable cause depend on the information known to the officers at the time, not subsequently obtained information, and the amended complaint does not allege that the officers knew any of this information alleged in the amended complaint at any time during the seizure. *See United States v. Hicks*, 531 F.3d 555, 558 (7th Cir. 2008) (reasonable suspicion); Gower *v. Vercler*, 377

[4] The Officer Defendants also inappropriately attempt to inject details of Nephew's death into the Court's calculus at the pleading stage. Nowhere does the amended complaint allege that Nephew used cocaine on the night of the incident, nor do the Officer Defendants provide any support for this assertion. At the motion to dismiss stage, the Court considers only the well-pleaded facts in Brady's amended complaint and draws all reasonable inferences from those facts in her favor. *Kubiak*, 810 F.3d at 480–81; *Columbus v. Travelers Ins. Co.*, 725 F. Supp. 396, 398 (N.D. Ill. 1989) ("The court cannot rely on defendant's assertions of fact which go beyond the scope of the pleadings in deciding this motion."). Because Brady's amended complaint says nothing about cocaine use, the Court will not consider such allegations at this stage.

F.3d 661, 668 (7th Cir. 2004) (probable cause). When Officers Leininger and Berninger arrived at the scene, the amended complaint alleges that they essentially knew two things: (1) an unknown person requested a well-being check on Nephew, and (2) when they arrived, Nephew was on the ground in the roadway "rolling from side to side, in obvious distress," and Brady was "rendering comfort and basic aid to him." Doc. 20 ¶ 22. Nonetheless, the Officer Defendants argue that the facts known to them gave them reason to believe that Nephew was experiencing a drug overdose and that Brady had provided drugs to Nephew. They fail to explain, however, why they believed that Brady was involved apart from being present at the scene. *See Seymour*, 519 F.3d at 797–98 ("[W]here the facts allegedly giving rise to a suspicion of criminality may reasonably appear to untrained eyes to be innocent in nature, we require some explanation regarding how the officer's training endowed seemingly innocent facts with criminal significance."). And mere presence, alone, does not support reasonable suspicion or probable cause. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." (citation omitted)); *United States v. Bohman*, 683 F.3d 861, 864 (7th Cir. 2012) ("A mere suspicion of illegal activity at a particular place is not enough to transfer that suspicion to anyone who leaves that property."); *United States v. Johnson*, 170 F.3d 708, 720 (7th Cir. 1999) ("Without reasonable suspicion, they cannot detain a person just because that individual walks out of an apartment on New Year's Eve, even if some unspecified individual (whose reliability is

utterly untested) thinks something fishy is sometimes going on there." (citation omitted)); *cf.* *Michigan v. Summers*, 452 U.S. 692, 705 (1981) (officers could detain occupant of premises while conducting a search pursuant to a warrant).

The Eighth Circuit addressed a similar situation in *Seymour*, 519 F.3d 790. In *Seymour*, police responded to a call that plaintiffs' four-month-old son was not breathing; the child ultimately died. *Id.* at 793. When police arrived, they told the father he was not free to leave and questioned him for at least forty-five minutes to determine whether the incident was the result of child abuse. *Id.* at 794. The court noted that the child's death could be innocently explained as the result of Sudden Infant Death Syndrome or another medical issue. *Id.* Because the Officer Defendants did not "adequately explain how their training and experience might have led a reasonable officer to suspect that [the father] had committed a crime," the court held that the seizure was not supported by reasonable suspicion and thus could not justify the detention. *Id.* at 798.

Here, Brady informed Officers Leininger and Berninger that Nephew was epileptic and was having a grand mal seizure. The officers then asked, for the first of many times, whether Nephew had taken any drugs, which Brady denied. Brady then continued to deny Nephew had used any drugs and continued to urge the officers that he needed emergency medical treatment for his seizure. Like in *Seymour*, Nephew's behavior could be innocently explained as resulting from his epilepsy, and the amended complaint does not provide support for why the Officer Defendants would have believed a drug overdose was more likely, or that Brady was involved in any way, particularly after Brady repeatedly explained the circumstances giving rise to Nephew's behavior to the Officer Defendants. Therefore, because the Court cannot conclude

from the pleadings that the Officer Defendants had reasonable suspicion or probable cause to seize Brady, the Court allows Brady's illegal seizure claim to proceed.[5]

## II. Illegal Search (Count II)

The Officer Defendants next move to dismiss Brady's Fourth Amendment illegal search claim, arguing that the search of her house was reasonable under the circumstances because the Officer Defendant suspected Nephew ingested drugs in the house, leading to his death. Brady argues that searching her house, over her express objection, without probable cause or a warrant was *per se* unreasonable.

"A warrantless entry into a private home constitutes a search and presumptively is unreasonable under the Fourth Amendment." *Leaf v. Shelnutt*, 400 F.3d 1070, 1081 (7th Cir. 2005). The Officer Defendants simply argue that their search of Brady's home was reasonable because they had probable cause to believe Nephew had taken drugs in the home because he resided there and his strange behavior began in the home. But they do not explain how these facts could overcome the presumption that such a search is unreasonable. Even assuming that these facts gave them probable cause for the search, "to overcome the presumption that a warrantless search of a home is unconstitutional, the defendant must show that it had both probable cause for the search *and* exigent circumstances that excuse its failure to obtain the warrant." *Pratt v. Chicago Housing Auth.*, 848 F. Supp. 792, 795 (7th Cir. 1994) (emphasis added); *see also Reardon v. Wroan*, 811 F.2d 1025, 1028 (7th Cir. 1987) ("[A]bsent exigent circumstances or proper consent the police may not enter a person's home without a warrant even if probable cause exists to support an entry to search or arrest."). Here, the amended

---

[5] Even were the Court to find that the amended complaint suggests that the Officer Defendants had reasonable suspicion for a *Terry* stop, as alleged, the *Terry* stop was unreasonable because it extended beyond the length of time necessary to confirm or dispel the Officer Defendants' suspicions of criminality. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.").

complaint does not provide a basis for finding exigent circumstances, nor do the Officer Defendants set forth any such justification. Therefore, at this stage, Brady has sufficiently stated a claim for an illegal search.

## III. Conspiracy (Count III)

Brady also claims that the Officer Defendants conspired to violate her constitutional rights. To support conspiracy liability under 42 U.S.C. § 1983, Brady must allege "(1) the individuals reached an agreement to deprive [her] of [her] constitutional rights, and (2) overt acts in furtherance actually deprived [her] of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). The Officer Defendants argue that Brady has failed to state a claim because her amended complaint lacks allegations that the Officer Defendants reached an agreement to deprive her of her constitutional rights. To show an agreement existed, Brady focuses on three points: (1) Nephew was a "targeted individual," (2) Berninger, Leininger, and Cruz conferred in private for approximately two minutes before deciding to search her home, and (3) only Berninger prepared a written police report, which she contends was done to "allow[] Defendants the ability to adapt new facts at will." Doc. 81 ¶ 27. Initially, as Brady alleges that the Officer Defendants conspired to violate *her* constitutional rights, it is unclear how the fact that Nephew was a "targeted individual" could support her claim.

Brady alleges that "it was apparent" that during their private conversation, Berninger, Leininger, and Cruz were "formulating a strategy as to how to proceed" and shortly thereafter told Brady they would be searching her home. Doc. 20 ¶¶ 54, 56. It is reasonable to infer from this allegation that the "strategy" the Officer Defendants discussed was how to search the home without a warrant. *See Beaman*, 776 F.3d at 511 (noting that "[b]ecause civil conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use

circumstantial evidence to establish a conspiracy"). Although further factual development may ultimately undermine her claim, at this stage, Brady has adequately pleaded a claim for civil conspiracy. *See Virnich v. Vorwald*, 664 F.3d 206, 213 (7th Cir. 2011) (holding that the "agreement" element was satisfied where defendants allegedly "agreed, and then acted in cooperation").

## IV. Failure to Intervene (Count IV)

Brady also claims that the Officer Defendants each failed to intervene to prevent her constitutional rights from being violated. A plaintiff may prevail against an officer that did not himself infringe on the plaintiff's rights if that officer "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). The Officer Defendants argue that the Court should dismiss this claim because Brady has not alleged a constitutional violation or any opportunity to prevent it. Brady responds that she was illegally seized and that her home was searched without a warrant and that "[a]ny Defendant could have prevented this course of action at any time." Doc. 81 ¶ 30.

As discussed above, the Court finds that Brady has stated Fourth Amendment search and seizure claims. Thus, if the Officer Defendants had a realistic opportunity to prevent the violations, Brady's failure to intervene claim will proceed. *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Although Brady's amended complaint may not be a model of clarity, it supports an inference that the Officer Defendants had opportunities to intervene. For instance, she alleges that the Officer Defendants were present during the search and seizure, observed the other officers' interactions with her, and each had opportunities to intervene but chose not to. *See* Doc. 20 ¶¶ 27–29, 31, 38, 39, 43, 50–52, 54, 56, 58, 59, 61, 62. While additional facts uncovered during the discovery process may subsequently undermine her claim, at this

preliminary pleading stage, Brady has stated a failure to intervene claim against the Officer Defendants.[6] *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) ("Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury *could not possibly conclude otherwise*." (citation omitted)).

## V. Qualified Immunity

The Officer Defendants argue that qualified immunity protects them from liability for their actions. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (citation omitted) (internal quotation marks omitted). "In other words, qualified immunity shields from liability police officers who act in ways that they reasonably believe to be lawful." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (quoting *Jewett v. Anders*, 521 F.3d 818, 822 (7th Cir. 2008) (internal quotation marks omitted). At the motion to dismiss stage, to overcome an assertion of qualified immunity, Brady must have alleged a violation of a statutory or constitutional right that was clearly established at the time of the violation so that a reasonable officer would have known of the unlawfulness of his conduct. *Hanson v. LeVan*, 967 F.3d 584, 592 (7th Cir. 2020). "Because a qualified immunity defense so closely depends 'on the facts of the case,' a 'complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds.'" *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) (citation omitted).

---

[6] The Officer Defendants also argue that Brady has not sufficiently alleged that they caused or participated in the alleged constitutional violation. *See Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) ("It is well established that [f]or constitutional violations under § 1983 . . . a government official is only liable for his or her own misconduct." (alteration in original)). This argument borders on frivolous. As recounted above, Brady specifically alleges the roles of each of the Officer Defendants in allegedly depriving her of her constitutional rights, as well as their failure to intervene to prevent those violations from occurring.

The Officer Defendants argue that Brady has failed to adequately allege the violation of any constitutional rights. But as explained above, the Court finds that Brady has stated claims for illegal search and seizure under the Fourth Amendment. Further, Brady's rights to be free from a warrantless search of her home and to be free from unreasonable seizure absent probable cause were clearly established at the time of the incident. U.S. Const. amend IV; *see Payton v. New York*, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment draws a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."); *Saptya v. Gupta*, No. 01 C 5912, 2001 WL 1636893, at *2 (N.D. Ill. Dec. 20, 2001) ("It is well-settled law that the Fourth Amendment generally prohibits the warrantless search of a person's home."); *Terry*, 392 U.S. at 20; *see also Konsionowski v. Sikorski*, No. 19-cv-0596-bhl, 2022 WL 613297, at *8 (E.D. Wis. Mar. 2, 2022) ("It has been clearly since at least *Terry v. Ohio*, 392 U.S. 1 (1968), that officers may not detain private citizens without reasonable suspicion of criminal activity."). Therefore, the Court finds that, at this stage, qualified immunity does not bar Brady's federal claims against the Officer Defendants.

## VI. Official Capacity Claim against Chief Roalson

Next, the Court must consider whether Brady has sufficiently alleged a claim against Chief Roalson in his official capacity.[7] Brady cannot hold Chief Roalson liable under § 1983 based on *respondeat superior*. *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). But, pursuant to *Monell*, Brady can sue Chief Roalson in his official capacity under § 1983 by

[7] Count VIII is titled "Under Both 42 U.S.C. § 1983 and Illinois State Tort – Respondeat Superior, 8th Amendment – Deliberate Indifference, and Common Law." Doc. 20 at 27. Based on Brady's allegations under this claim (Doc. 20 ¶¶ 133–139), the Court interprets this as an attempt to hold the city liable for the officers' actions under *respondeat superior* (for the state law claims) and *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691 (1978) (for the federal claims). The Court addresses the *Monell* allegations here and the state law allegations below.

showing that the Ottawa Police Department's policy or practice was the "moving force of the constitutional violation." *Monell*, 436 U.S. at 694. To state a *Monell* claim, Brady must allege (1) an express policy that, when enforced, causes a constitutional violation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority. *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000).

Throughout her amended complaint, Brady makes myriad references to policies or practices of the Ottawa Police Department. *See, e.g.*, Doc. 20 ¶ 24 ("It is a regular practice of Ottawa Police Department [sic] for only one officer to write a report to avoid any conflicting information. Other officers will then read that *one* report prior to any testimony."); *id.* ¶ 65 ("There exists a threatening practice of trashing and/or destroying property under the guise of 'executing a search warrant' (if voluntary consent is not given and sometimes when it is). Illicit conduct that is meant to 'chill' resistance."); *id.* ¶ 72 (Roalson "is only sued in his official capacity because he, alone, has the ultimate responsibility for the promulgation and implementation of policies, procedures, practices, training, customs, and conduct of officers in the Ottawa Police Department"); *id.* ¶ 73 ("Mark Nephew was a 'targeted individual' of the Ottawa Police Department officers."); *id.* ¶ 74 ("Ottawa Police Department officers have a practice of targeting certain people and constantly harassing them, including but not limited to pulling over vehicle(s) with them in it and pressuring searches of the vehicle, stalking their homes they live in and arresting them on questionable 'flimsy' evidence (if any evidence at all). Constantly issuing traffic tickets, Officers *always* claiming to smell marijuana or saying the drug dog 'hit' when it did not indicate at all, to initiate unlawful searches."); *id.* ¶ 76 ("The Ottawa

Police Department has a citizen complaint process, however, it's hardly a transparent process for dealing with civilian complaints against officers. Nor does OPD provide officers disciplinary or complaint records, even when subpoenas are issued for them."); *id.* ¶ 136 (the Officer Defendants' "actions were sanctioned, either by policy or omission, practices and/or customs, and/or through the Ottawa Police Department's lack of transparent complaint process by citizens against officers, and lack of transparent disciplinary process against officers."); *id.* ¶ 137 ("The Ottawa Police Department, by and through Chief Roalson, remains deliberately indifferent by the following (but, not limited to): Allowing the continuance of these unconstitutional and tortuous practices, and/or customs, and failure to train, discipline, investigate complaints against officers, or implement appropriate written policy and sanctions to correct them.").

But while Brady makes plenty of allegations about policies or practices, she fails to connect them to any violations of *her* constitutional rights. She does not allege, for instance, that the Ottawa Police Department had a widespread practice of detaining people for an excessive amount of time without probable cause or searching homes without warrants. While Brady alleges that Nephew was "a targeted individual," subject to certain practices of the Ottawa Police Department, she brings this case solely on her own behalf and thus cannot maintain a claim based on a policy or practice that she alleges affected Nephew but not her. In other words, Brady has not alleged the required connection between any policies or practices and the violation of her constitutional rights. *See Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (policy or practice "must be the direct cause or moving force behind the constitutional violation" (citation omitted) (internal quotation marks omitted)). Thus, she cannot proceed on her *Monell* claim against Chief Roalson.

## VII. Illinois State Law Claims (Counts V–VIII)

In addition to her claims under 42 U.S.C. § 1983, Brady brings claims under Illinois state law alleging intentional infliction of emotional distress (Count V), negligent infliction of emotional distress (Count VI), negligence (Count VII), and deliberate indifference (Count VIII). Defendants argue that Brady's state law claims are barred by the one-year statute of limitations under the Illinois Tort Immunity Act ("ITIA"). 745 Ill. Comp. Stat. 10/8-101. The statute of limitations is an affirmative defense that Brady need not anticipate in her amended complaint to survive Defendants' motion to dismiss. *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). But that is not the case where "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint reveals that an action is untimely under the governing statute of limitations." *Id.*; *see also Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (considering statute of limitations defense on motion to dismiss where relevant dates were set forth in the complaint).

The ITIA contains a one-year statute of limitations. 745 Ill. Comp. Stat. 10/8-101. Each of Brady's state law claims accrued on the date of the incident, March 27, 2020. *See Brown v. Kouretsos*, No. 15 C 11076, 2016 WL 3269000, at *3 (N.D. Ill. June 15, 2016) (intentional and negligent infliction of emotional distress); *Fetzer v. Wood*, 211 Ill. App. 3d 70, 79 (1991) (negligence). Because Brady first filed her complaint approximately two years later, the ITIA's one-year statute of limitations bars her state law claims.

But Brady contends that the statute of limitations does not apply because the Officer Defendants' conduct was willful and wanton and thus not covered by the ITIA. *See* 745 Ill. Comp. Stat. 10/2-202 ("A public employee is not liable for his act or omission in the execution or enforcement of any law *unless such act or omission constitutes willful and wanton conduct*."

(emphasis added)). But while Section 2-202 provides that the ITIA does not extend immunity to willful or wanton acts, it does not alter the one-year limitations period. *See Luciano v. Waubonsee Cmty. Coll.*, 245 Ill. App. 3d 1077, 1086 (1993) ("[A]llegations of willful and wanton conduct do not deprive a local public entity and its employees of the benefit of the shorter limitations period provided in section 8-101."); *see also Cooperwood v. Farmer*, 315 F.R.D. 493, 500 (N.D. Ill. 2016) ("[A]lthough the Tort Immunity Act does not extend immunity to acts of public employees that are willful and wanton, the statute of limitations under the Tort Immunity Act applies to public employees, even if the public employee's conduct is willful and wanton."); *Sroga v. De Jesus*, No. 12 C 9288, 2013 WL 2422869, at *6 (N.D. Ill. June 3, 2013) (finding one-year statute of limitations applies even where police officers acted willfully and wantonly). Because Brady's state law claims are time-barred, the Court dismisses them with prejudice.

Defendants further argue that if there are no remaining state law claims, Brady's claim for indemnification (Count IX) must also be dismissed. But while a claim for indemnification is brought via state law, it also applies to Brady's federal claims. *See Walker v. Cnty. of Cook*, No. 05 C 5634, 2006 WL 2161829, at *7 (N.D. Ill. July 28, 2006) (indemnification applies to both state and federal claims). Because Brady may proceed on her federal claims, her indemnification claim may also proceed.

**VIII. Punitive Damages**

Finally, Defendants correctly point out that the City of Ottawa may not be subject to punitive damages. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *see also Hammond v. Town of Cicero*, 822 F. Supp. 512, 516 (N.D. Ill. 1993) ("Municipalities may not be subject to punitive damage awards pursuant to § 1983."). Although Brady may pursue

punitive damages directly from the Officer Defendants, in Illinois "municipalities may not indemnify individual defendants for punitive damage awards against them." *Hammond*, 822 F. Supp. at 516. Therefore, the Court strikes Brady's demand for punitive damages against the City of Ottawa.

**CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss [47]. The Court dismisses Brady's official capacity claim against Chief Roalson without prejudice, and Brady's state law claims (Counts V–VIII) with prejudice. The Court strikes Brady's demand for punitive damages against the City of Ottawa.

Dated: April 10, 2023

SARA L. ELLIS
United States District Judge